BEND PLAZA, a joint venture
of STATE FINANCE COMPANY and
WILLIAM B. WEBBER
*v.*
DEPARTMENT OF REVENUE

Richard A. Uffelman, Martin, Robertson, Neill & Uffelman, Portland, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered October 18, 1978.

CARLISLE B. ROBERTS, Judge.

Bend Plaza is the assumed business name of a joint venture of State Finance Company and William B. Webber and is the owner of improved real property known as the Bend Plaza Shopping Center, located on the east side of Third Street (U. S. Highways 20 and 97), north of Franklin Avenue and south of Hawthorne Avenue, in Bend, Oregon. The property occupies two city blocks (in addition to the vacated Greeley Avenue which lies between the two blocks), totaling more than six acres, and includes almost 84,000 square feet of improvements. The property is described on the Deschutes County assessment rolls as Tax Lot 10000 and Tax Lot 10001, Map 17-12-33CB.

As of the assessment date, January 1, 1976, the county's assessed value for the property was $1,689,020. The plaintiff petitioned the defendant to reduce this value to $1,228,000 and, at the hearing before the defendant, the county sought to increase the value to $1,750,000. The defendant in its Order No. VL 77-429, dated August 5, 1977, affirmed the original assessed value (which had been approved by the county board of equalization). It is a commentary on the art of appraisal that, although the plaintiff again pleaded for a value of $1,228,000 and the defendant pleaded that its order should be sustained in all respects, in the trial before this court the first of plaintiff's two expert witnesses concluded that the value should be $1,380,000 ($152,000 more than

pleaded), the plaintiff's second witness recommended $1,390,000 and the defendant's sole expert witness asserted a value of $1,550,000 ($139,000 less than defendant had pleaded).

■ The appraisal of a shopping center constitutes a special problem. "A shopping center may be loosely defined as a group of retail stores under a single or limited ownership, managed as a unit and providing off-street parking. Such a definition includes the small local convenience or neighborhood center, medium-sized community shopping center, and the large regional suburban shopping center." *See* Hoyt, M.A.I., *Appraisal of Shopping Centers,* in *Encyclopedia of Real Estate Appraising,* ch 17, 402 (Friedman ed, rev & enlarged ed 1968). Hoyt states, at 405-406:

> "All the property in the modern type of suburban shopping center, including stores and parking space, *must be valued as an aggregate* because of two factors:
>
> "1. The common parking area.
>
> "2. The favored position of the department store around which the center is planned and built.
> "* * * * *
>
> "In modern shopping centers, it is well known that the 'leaders,' the department stores, secure favorable terms which sometimes amount to a sale of the land that they occupy at a price below the market price or even a gift of the land. The percentage paid on the volume of sales by the specialty apparel stores, which come into the center only because the department store has made a commitment, yields a higher rent per square foot. *This larger return could not have been obtained, however, without the magnet of the department store,* which attracts shoppers from a very wide trade area." (Emphasis supplied.)

The Bend Plaza Shopping Center was constructed in 1965, with initial rental beginning in the fall of 1965 and the spring of 1966. The original "anchor" or "triple-A" tenant was and is a Safeway Store, to which was added a second anchor, Sprouse-Reitz. Twenty-one additional tenants are specialty shops which utilize

smaller spaces and generally are under local management. The Safeway lease, executed on December 3, 1964, before the construction of the shopping center began, runs from January 1, 1966, to December 31, 1985, and calls for an annual rental of $35,554.68. In addition, Safeway has six 5-year renewal options at an annual rental of $14,034.72. Thus, Safeway is obtaining 27,500 square feet (about one-third) of the 77,250 square feet of rentable space for approximately $1.29 per square foot, whereas, at the assessment date, the subject property was producing a gross rental of $2.43 per square foot. The plaintiff asserts that, as of the assessment date, Safeway was paying "market rental" and the defendant denies it.

■ The expert witnesses of both plaintiff and defendant agreed that the highest and best use of the subject property was for its present purposes. The expert appraisers independently determined that the market data and the cost approaches to value were useless in this instance and each relied upon the income approach. This valuation procedure is most useful for real estate which normally is bought and sold on the basis of its income-producing capabilities. Real estate competes with other classes of investments for capital. While investors' motives and goals are diversified, the buyer of an income-producing property generally is interested in a "good investment." Estimating potential gross income (gross economic income) is the normal starting point for the appraiser. This is followed by an analysis of the necessary operating expenses to obtain an estimate of net income and this in turn is followed by a selection of the rate at which the net income is to be capitalized (a rate which usually includes, in tax assessment cases, a percentage to offset taxes as well as a selected percentage for capital recapture (future depreciation)). *See* International Association of Assessing Officers, *Assessing and the Appraisal Process,* 79 et seq. (5th ed 1974).

■ The plaintiff's second expert witness and the defendant's sole expert witness substantially diverged

from this program (1) by their treatment of estimated real estate taxes as a deduction and (2) by their treatment of depreciation (apparently through their analysis of the contract provisions which imposed substantial maintenance expense upon the lessees, to which defendant's witness added a reserve for replacement of $9,050, as shown in the schedules below). As mentioned above, in appraisals such as this property requires, these items of taxes and depreciation typically are accounted for in the capitalization rate, as a percentage, because of the uncertainty of the amount of taxes and depreciation deductible over the useful life of the property. There are also a number of differences between the appraisals of plaintiff's second witness and defendant's sole witness but the chief difference grows out of the latter's adjustment to gross rental income by increasing the Safeway site's "economic rental" to $2.50 per square foot, on the supposition that the Safeway lease was economically outmoded.

The following table and footnotes reveal some of the variances in the income approaches used by plaintiff's and defendant's witnesses:

|                              | Plaintiff  |            | Defendant  |            |
|------------------------------|-----------:|-----------:|-----------:|-----------:|
| Gross income estimate:       |            |            |            |            |
| Safeway                      |            | $ 35,872   |            | $ 69,050   |
| Sprouse-Reitz                |            | 12,183     |            | 12,183     |
| Small shops (1975)           | $139,349   |            |            |            |
| (vacancy)[1]                 | +5,295     | 144,644    |            | 139,349    |
| Estimated gross income       |            | $192,699   |            | $220,582   |
| Less vacancy allowance       |            | (7,232)[2] |            | (1,381)[3] |
| Effective gross income       |            | $185,467   |            | $219,201   |
| Expenses:                    |            |            |            |            |
| Maintenance                  | $ 12,441[4] |           | $ 9,520[5] |            |
| Insurance                    | 2,645      |            | 2,645      |            |
| Management                   | 9,273[6]   |            | 10,960[7]  |            |
| Legal and accounting         | 2,700      |            | 2,710      |            |
| Advertising                  | 2,190      |            | 2,200      |            |
| Miscellaneous                | —          |            | 1,500[8]   |            |
| Common area costs            | 6,406[9]   |            | 4,030[10]  |            |
| Reserves for replacement     | —          |            | 9,050      |            |
| Total expenses               |            | (35,655)   |            | (42,615)   |
| Net income before taxes      |            | 149,812    |            | 176,586    |
| Real estate taxes (est.)     |            | (10,700)   |            | (14,069)   |
| Net income before recapture  |            | $139,112   |            | $162,517   |
| Capitalization rate          |            | 10%        |            | 10.5%      |
| Capitalized value (rounded)  |            | $1,390,000 |            | $1,550,000 |

[1] Actual vacancy loss, 3.8 percent, added to income, subject to later allowance (deduction) of 5 percent.

[2] Calculated at 5 percent of small shop income.

[3] Defendant's adjustment for vacancy was estimated at 2 percent of the rental paid by Safeway, only!

[4] Deemed reasonable by plaintiff's witness, based on shopping center study.

[5] Calculated by defendant's witness, based on study of plaintiff's leases.

[6] Plaintiff had used 4 percent; its witness used 5 percent of effective gross income.

[7] Defendant's witness increased plaintiff's actual charge (3.9%) to 5 percent.

[8] Defendant did not explain this item.

[9] Plaintiff's witness used a 1975 net based on an analysis of data from Sprouse-Reitz and the smaller lessees.

[10] Defendant's witness used 3-year average net to landlord.

The work of the expert appraiser must be judged by the manner in which it would be considered by the "willing buyer-willing seller" within the defendant's definition of market value. *See* defendant's rule, OAR 150-308.205-(A).

The investor interested in the purchase of Bend Plaza Shopping Center could be equally interested in a similar shopping center in Gresham, Portland, Eugene, North Bend, or Roseburg, and the witnesses for each party adverted to sales of such properties and supplied square foot rental values, but in no instance, in the court's view, did the witnesses show that the out-of-town properties listed were truly comparable to the subject property. (Superficial explanations and descriptions took too much for granted.) A good deal of testimony was also given to the subject property's chief competitor, the Wagner Mall, located a few blocks north of subject property, also on Highway 97. However, the Wagner Mall produced a gross rent of only $2.27 per square foot, as compared to the subject property's $2.43 (thus no indicator of a higher value for the subject), and, more significantly, the relationship between Mr. Wagner, the chief owner, promoter, and user of the mall, vis-a-vis his smaller tenants, created more questions than answers on the question of comparability to subject property.

Defendant's witness used a 10.5 percent capitalization rate, more favorable to the plaintiff than the 10 percent selected by plaintiff's second witness. Plaintiff's witness based the 10 percent rate on six shopping center sales which revealed a range of 9.4 to 11.88 percent. In his opinion, the two most comparable were 10.33 and 10.18. He then chose the conservative figure of 10 percent. Defendant's witness studied three comparable sales (including the two used by plaintiff's witness) from which capitalization rates of around 10.2 percent were developed. Judging the subject property to be subject to more risk than the models, he chose the 10.5 divisor. Each of these rates appears to

be reasonable. The foundations laid by the witnesses were not sufficiently detailed to give the court conviction as to the validity of one over the other.

■ However, the preponderance of the evidence favors the plaintiff on the subject of the Safeway lease as representing economic rent for an anchor establishment. Both the plaintiff's witnesses were able, experienced appraisers, apparently with far more experience in the special field of shopping centers than was defendant's capable witness. Their presentation carried greater weight with the court because it appeared more nearly complete and more logical. As above stated, the *Encyclopedia of Real Estate Appraising, supra,* specifically notes that favored contracts are necessarily given to "anchor" lessees and, in the court's view, any knowledgeable purchaser of an operating shopping center would accept this requirement as normal and essential. The quid pro quo for the differential is obvious and is offset by the rentals paid by other lessees. The different rental rates for one or more triple-A lessees and the numerous satellite lessees are all within the "market."*

Plaintiff's appraiser allowed the shopping center the customary 5 percent for vacancy but defendant, curiously, allowed only a 2 percent vacancy as against the Safeway Store rental (the last rental in which a loss could be expected to occur under the contract).

In a close case, with many items of the testimony lacking a solid foundation, a weighing of the judgment demonstrated and exercised by the experts may be controlling.

The court concludes that the preponderance of the evidence has been adduced by the plaintiff.** The court

---

*The county assessor, nevertheless, should appraise the shopping center as an aggregate. *Henshaw/Lyon et al v. Dept. of Rev.,* 5 OTR 263 (1973).

**The court has noted plaintiff's argument that it has overturned the "presumption of official rectitude" of the assessor in his initial appraisal.

holds that the true cash value of the subject property on January 1, 1976, was $1,390,000. (Insufficient data were supplied to enable the court to allocate the value between land and improvements.) Defendant's Order No. VL 77-429 is set aside and held for naught. The Assessor and Tax Collector for Deschutes County shall amend the assessment and tax rolls for the 1976-1977 tax year as required by this decision and determine and insert the correct figures in the assessment and tax rolls. If the plaintiff has overpaid the tax thus determined, the county commissioners shall refund any excess payments with interest, pursuant to ORS 311.806 and 311.812.

Costs are awarded the plaintiff.

_____

This argument is rendered moot by *J. R. Widmer, Inc. v. Dept. of Rev.,* 261 Or 371, 494 P2d 854 (1972). The court has noted defendant's earnest argument based on the distinction between actual rentals of a property and economic rentals, citing *Swan Lake Mldg. Co. v. Dept. of Rev.,* 257 Or 622, 478 P2d 393, 480 P2d 713 (1971), but the court distinguishes *Swan Lake* on the facts in this case, where the defendant is attacking a lease as not representing economic rent and in which neither side has established, on a firm foundation, the economic rentals of shopping centers in the Bend area other than as indicated by the subject property.